FILED
2024 Jan-19  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| CURTIS DAVIS, *et. al*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 6:18-cv-1433-LSC |
| v. | ) | |
| | ) | |
| MAR-JAC POULTRY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION AND ORDER**

Before the Court is Plaintiffs' Motion to Reconsider Certification of a Rule 23(b)(3) class (Doc. 153) and Defendant Mar-Jac Poultry, LLC's (hereinafter "Mar-Jac") Brief in Support of Reconsideration of Class Certification of a Rule 23(b)(2) class (Doc. 150). This is the third time that the Court has considered, and ruled on, class certification. For the reasons explained below, the Court reaffirms certification of a Rule 23(b)(2) class and denial of a Rule 23(b)(3) class.

## I.   PROCEDURAL HISTORY

This case was filed by Curtis Davis, an African-American male, on September 4, 2018. (Doc. 1.) Davis asserted three causes of action based on his unsuccessful application for employment at Mar-Jac's poultry-processing plant in January 2018: Count I: Title VII – Disparate Impact; Count II: Title VII and § 1981 – Intentional Disparate Treatment; and Count III: Title VII – Punitive Damages. (Doc. 29.) He

1

claims racial and national origin discrimination.[1] He believes that Mar-Jac intentionally discriminated against non-Hispanic job applicants through a variety of policies and practices aimed to recruit and prefer Hispanic applicants. And he believes that Mar-Jac's "three-strikes" policy, where an applicant with three previous unsuccessful employment stints at Mar-Jac was presumptively ineligible for rehire, disparately impacted non-Hispanic applicants. He further sought to represent a putative class of non-Hispanic applicants whose applications were likewise rejected by Mar-Jac.

Davis first moved to certify a "hybrid class for injunctive and declaratory relief under Rule 23(b)(2) and for monetary relief under Rule 23(b)(3)" on March 2, 2020. (Doc. 43 at 1.) The Court had for consideration three particularly significant pieces of evidence: 1) the deposition testimony of Mar-Jac's Complex Human Resources Manager, Linda Cox, and Human Resources Clerk, Melissa Pendley, both of whom admitted to hiring managers requesting and preferring Hispanic applicants;[2] 2) the analyses and testimony of Dr. Liesl Fox, a statistician and

---

[1] Unlike his Title VII claims, his § 1981 claim may only encompass racial discrimination, not discrimination based on national origin. *See Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006).

[2] Cox additionally testified that she saw supervisors filter through stacks of applications to find Hispanic applicants (Doc. 46-2 at 225–27) and that for years at a time, certain members of Mar-Jac's leadership would ignore or "overrule[]" the three-strikes policy as to certain applicants (Doc. 46-2 at 56–63).

consultant, who found a statistically significant disparity between the racial composition of Mar-Jac's workforce and that of the surrounding labor market and who determined the three-strikes rule had an adverse impact against non-Hispanic applicants; and 3) affidavits from Deivin and Crystal Escalante, dated March 2, 2021. (Doc. 122.)

In the affidavits, the Escalantes asserted that Cox approached Deivin Escalante on February 19, 2018 and "offer[ed] to pay $100 for every Hispanic person [he] referred to the Jasper Plant that it hired. . . .She made it clear that she wanted [him] to refer Hispanics to the plant. She also said then and later, like others with Mar-Jac (Ricky Roberts, Billy McNeil (production managers)), that Hispanic laborers were preferred because they work harder, complain less, are more reliable, and similar comments." (Doc. 116-1 ¶ 6; Doc. 116-2 ¶ 6.) But, according to the affidavits, before the Escalantes even began operating under this referral agreement, Cox approached Deivin Escalante again and proposed that the Escalantes directly hire workers to work at Mar-Jac. (Doc. 116-1 ¶ 7; Doc. 116-2 ¶ 7.) This became the first official contract between Mar-Jac and the Escalantes, which was dated March 5, 2018. (Doc. 152-2.) The Escalantes also testified that Cox and McNeil made clear that sending non-Hispanic workers was "not acceptable" and that they "were not to send them white trash." (Doc. 116-1 ¶ 10; Doc. 116-2 ¶ 10.)

Despite this evidence, the Court denied certification of either type of class in its March 30, 2021 Opinion. (Doc. 122.) The Court determined that all the requirements of Rule 23(a) were satisfied. (*Id.* at 28.) However, regarding the Rule 23(b)(3) class, the Court found that individual issues predominated issues common to the class for both the disparate treatment and disparate impact claims. (*Id.* at 32.) For the Rule 23(b)(2) class, the Court denied certification because Davis had not shown how injunctive or declaratory remedies would provide relief to the entire class. (*Id.* at 34.)

On August 5, 2021, the Court reconsidered class certification. (Doc. 131.) In that Opinion, the Court determined that certification under Rule 23(b)(3) remained inappropriate because individual issues predominated. (*Id.* at 6.) But the Court found that an injunctive and declaratory relief class was due to be certified under Rule 23(b)(2). (*Id.*) The Court explained that sufficient evidence showed that Mar-Jac acted "on grounds that apply generally to the class as a whole, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." (*Id.* at 6–7 (citing Fed. R. Civ. P. 23(b)(2)).) In particular, the Court highlighted Pendley's admission that hiring supervisors requested and preferred Hispanic applications, and that she watched hiring supervisors sift through stacks of applications in search of Hispanic prospects. (Doc. 131 at 7.) The Court then explained that an injunction or series of injunctions restructuring and restricting

Mar-Jac's hiring practices would benefit the class as a whole because it would allow class members to seek employment "on equal footing" with Hispanic applicants. (*Id.* at 7–8 (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).) The Court suggested that it could prohibit hiring supervisors from intentionally disregarding non-Hispanic applications or enjoin Mar-Jac from hiring independent contractors to solely seek Hispanic workers. (Doc. 131 at 8.) Therefore, the Court certified the following Rule 23(b)(2) class:

> All persons not of Hispanic race and or origin seeking employment on or after February 22, 2016 in unskilled positions on the production floor of Mar-Jac's Jasper Plant, and not hired within 45-days after seeking such employment.

(*Id.*)

Then, on October 4, 2021, the Escalantes were criminally tried, and later convicted, for transporting illegal aliens to provide labor to the Mar-Jac plant and for money laundering. Mar-Jac subsequently moved to decertify the Rule 23(b)(2) class (Doc. 150) and Davis moved for reconsideration of a Rule 23(b)(3) class (Doc. 153). Davis's Motion in particular was premised on evidence from the Escalante trial. On March 1, 2023, the Court reopened discovery to allow Mar-Jac a chance to counter Davis's arguments, which heavily relied on evidence from the Escalante trial. (Doc. 165.) These Motions are now ripe for review.

## II.   STANDARD OF REVIEW

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). For that reason, "[t]he party seeking class certification has a burden of *proof*, not a burden of pleading." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016). Under Rule 23, the proponent of class certification must prove four things: 1) he has standing to represent the putative class; 2) the class is adequately defined and ascertainable; 3) the requirements of Rule 23(a) are met, meaning the class satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation; and 4) the class qualifies as at least one of Rule 23(b)'s categories of class actions. *See Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 (11th Cir. 2023); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). The district court is tasked with conducting a "rigorous analysis" to determine whether the proponent of class certification has proved that these requirements are "*in fact*" satisfied. *Id.* (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). "[I]f doubt remains about whether the [Rule 23] standard is satisfied, the party with the burden of poof loses." *Brown*, 817 F.3d at 1234.

The district court may "consider the merits [of the underlying claim] 'only' to the extent 'they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Brown*, 817 F.3d at 1234 (quoting *Amgen Inc. v.*

*Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). "But if a question of fact or law *is* relevant to that determination, then the district court has a duty to actually decide it and not accept it as true or construe it in anyone's favor." *Brown*, 817 F.3d at 1234.

A district court may reevaluate its previous findings as to class certification "in light of new or changing circumstances." *Shin v. Cobb Cnty. Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001) (first citing Fed. R. Civ. P. 23(c) ("An order [on class certification] . . . may be altered or amended before the decision on the merits."); then citing *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from the assertion to facts.")).

## III.   ANALYSIS

The Court's "analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). "[F]or a claim to be justiciable," the class representative must individually satisfy the requirements of Article III standing. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019). This means that the class representative must show: "(1) he has suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) [his] injury is fairly traceable to the conduct of the defendant; and (3) it is likely, not just merely speculative, that [his] injury will be

redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819–20 (11th Cir. 2003) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In its March 30, 2021 Opinion, the Court conducted a thorough standing analysis. (Doc. 122 at 22–23.) There, the Court explained that 1) Davis had suffered two injuries in fact, namely the loss of employment opportunities and income; 2) these injuries were "fairly traceable" to Mar-Jac's conduct because a reasonable jury could find that Mar-Jac hiring supervisors intentionally discriminated against non-Hispanic applicants like Davis and that the three-strike rule had a disparate impact on non-Hispanic applicants; and 3) these injuries were redressable due to the prospect of monetary damages and injunctive relief. (*Id.*)

However, in its Response to Davis's Motion for Reconsideration of Denial of a Rule 23(b)(3) Class, Mar-Jac questions whether Davis still has standing, at least to represent the Rule 23(b)(3) class. (Doc. 176 at 29.) This is because in Davis's Brief arguing for certification of the Rule 23(b)(3) class, Davis primarily bases his certification argument on the evidence from the Escalante trial. (Doc. 154.)[3] It is Mar-Jac's contention that Davis lacks standing to represent a class that is premised on any of Mar-Jac's activities with the Escalantes because the time period of Davis's applications and the Mar-Jac-Escalante dealings do not align. (Doc. 176 at 29–30.)

---

[3] Although in his Reply, Davis clarifies that "the Escalante evidence merely bolsters th[e] original evidence" it relied upon. (Doc. 180 at 2.)

8

In analyzing this timeline, a review of the evidentiary record is helpful. The Court starts with Davis's activities. On January 24, 2018, Davis submitted his first relevant application to Mar-Jac. (Doc. 46-2 at 160; Doc. 65-4 ¶ 5; Doc. 65-3 at 30–31.)[4] He sought "a position on the night shift in 2nd Processing or another area in the plant." (Doc. 65-4 ¶ 5.) Davis then returned to Mar-Jac on January 31 and resubmitted his application to a department supervisor. (Doc. 31 ¶¶ 45, 62; Doc. 92-1 ¶ 2.) Davis again sought a position in 2nd Processing, preferably one in the Debone Department, but this time regardless of shift. (Doc. 65-4 ¶ 7.) Although the supervisor offered him a position on the assembly line, Mar-Jac's Complex Human Resources Manager, Linda Cox, stepped in to prevent the supervisor from hiring Davis. (Doc. 176 at 17; Doc. 65-3 at 29; Doc. 65-4 ¶¶ 2, 4.) Davis was never contacted again by Mar-Jac regarding this position. (Doc. 39 ¶ 8; Doc. 65-3 at 29–30, 36; Doc. 92-1 ¶ 6.) It is not entirely clear from the record how long Davis's application was active.[5] Davis filed an EEOC charge, signed February 18, 2018 and

---

[4] Davis had previously worked at Mar-Jac and was terminated in 2012, 2013, and 2015. (Doc. 150-1 ¶ 5.) He then applied for employment to Mar-Jac eleven times from 2015 to 2018, with the last eight applications being rejected based on the three-strikes policy. (Doc. 176 at 17; Doc. 150-1 ¶ 5.) It is worth noting that since the initiation of this litigation that Davis was employed by Mar-Jac on July 6, 2023 until he voluntarily resigned on July 18, 2023. (Doc. 176-2 ¶ 4.)

[5] Mar-Jac's Deactivated Applications Log indicates that the initial January 24 application was deactivated on January 25, 2018. (Doc. 152-17 at Logs 413.) However, Davis went back to the plant to reapply on January 31. (Doc. 31 ¶¶ 45, 62; Doc. 92-1 ¶ 2.) Applications were typically active for thirty to forty-five days. (Doc. 46-1 at 112–15.) And in Cox's deposition, she testified that an application could be active for up to six months. (*Id.* at 112–13.)

filed February 22, 2018, asserting that Mar-Jac's "policies, patterns or practices, and/or selection procedures deny African-Americans: hiring opportunities and other terms and conditions of employment on the same terms applied to Hispanic and/or Latino employees." (Doc. 48-10 ¶ 10.)

Now to Mar-Jac. It is not abundantly clear when Mar-Jac began its business relationship with the Escalantes and their LLC, The Grand Family Enterprise. Mar-Jac claims that it began on March 5, 2018, when Mar-Jac signed its first official contract with the Escalantes. (Doc. 176 at 4, 9; Doc. 152-2.) Under this contract, the Escalantes were to staff a deboning line with fifteen workers. (Doc. 15-2.) Mar-Jac subsequently entered into a second official contract on March 5, 2019, in which the Escalantes were tasked with "staffing of 2 debone lines, portion tables, 8 persons for rehang, and 7 for stack off line for poultry processing on day shift and night shift." (Doc. 152-3.) The Escalantes continued to provide workers to Mar-Jac until October 2020. (Doc. 152-1 at 819.) However, prior to these official agreements, the Escalantes have claimed that Cox approached Deivin Escalante on February 19, 2018, offering to pay him $100 for each Hispanic person he referred to the pant. (Doc. 116-1 ¶ 6; Doc. 116-2 ¶ 6.) At trial, Deivin Escalante also testified that he may have started working with Mar-Jac as earlier as December 2017. (Doc. 152-1 at 838–39.) And at trial, Special Agent Steve Rogers testified that he first met with Mar-Jac officials on January 9, 2018 and that the Escalantes were provided by Mar-Jac as a

contractor. (Doc. 152-1 at 133–34, 155-60, 750, 772–74.) The government further presented evidence at trial showing that the Escalantes deposited money from Mar-Jac in January 2018 (Doc. 152-15).

The upshot here is that Davis sought employment at Mar-Jac from January 24, 2018 until at least February 22, 2018, when his EEOC charge was filed. While Deivin Escalante's testimony is disputed by Mar-Jac, the government in the Escalante trial presented indisputable evidence that Mar-Jac was paying the Escalantes in January 2018, despite the lack of any official contract. Therefore, the timeline of Davis's applications and Mar-Jac's dealings with the Escalantes does match up. As previously discussed, Davis alleged an injury by Mar-Jac that is redressable. The Escalante dealings bolster the causation finding. Davis has standing.

After determining that a class representative has standing, a district court must analyze whether the representative has shown that their proposed class is "adequately defined and ascertainable." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021). As the Eleventh Circuit has explained:

> Traditionally, we have collapsed class definition and ascertainability into one inquiry. *See DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). A class is inadequately defined if it is defined through vague or subjective criteria. *See id*. And without an adequate definition for a proposed class, a district court will be unable to ascertain who belongs in it. *Id.*

*Cherry*, 986 F.3d at 1302. "[A]dministrative feasibility is not a requirement for certification under Rule 23." *Cherry*, 986 F.3d at 1304. Administrative feasibility is relevant to whether a class may continue under Rule 23(b)(3), *id.* at 1301–04, but it "alone will rarely, if ever, be dispositive." *Id.* at 1305 (explaining the relevance of administrative feasibility to the manageability criterion of Rule 23(b)(3)(D), which is a superiority consideration). Rather, "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Id.*; *see also DeBremaecker*, 433 F.2d at 734 (explaining that a class of "residents of this state active in the peace movement" is not adequately defined or ascertainable). "It is not necessary that the members of the class be so clearly identified that any member can be presently ascertained." *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970).

Again, the current Rule 23(b)(2) class and proposed Rule 23(b)(3) class is as follows:

> All persons not of Hispanic race and or origin seeking employment on or after February 22, 2016 in unskilled positions on the production floor of Mar-Jac's Jasper Plant, and not hired within 45-days after seeking such employment.

From this definition, the following criteria is used to ascertain class membership: 1) the race and/or national origin of prospective class members; 2) whether prospective class members sought employment in unskilled positions on the production floor of

the Jasper Plant after a specific date; and 3) whether the prospective class members were not hired within 45-days of submitting an application.

Mar-Jac argues that the class, as currently certified under Rule 23(b)(2) and which Davis also seeks to certify under Rule 23(b)(3), is not adequately defined and ascertainable because 1) "Hispanic" is a "pseudo-racial category" and so "non-Hispanic will be exceedingly difficult to identify,"[6] and 2) because "Plaintiff has yet to explain how he will determine who belongs in the class he proposes to represent" based on the available documentary evidence. (Doc. 176 at 17–18.)

The Court easily dispenses with the first argument. Mar-Jac heavily relies on the Supreme Court's recent opinion in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) for the assertion that the term "Hispanic" is "arbitrary or undefined." *Harvard*, 600 U.S. at 216. But the *Harvard* case involved a very different factual context. It was about affirmative action policies in university admissions. The Supreme Court never indicated that it aimed to eliminate all class actions involving Hispanic or non-Hispanic people. And that was for good reason because people commonly either identify as "Hispanic" or "non-Hispanic," and others are usually able to determine whether a person appears to be of Hispanic race or origin without difficulty or controversy. *See Equal Emp.*

---

[6] While Davis argues in the Reply that Mar-Jac has waived this argument, Mar-Jac has articulated a version of this argument since the original briefing of the class certification question. (Doc. 63 at 3.) Therefore, it has not been waived.

*Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016) (citing *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980) for the proposition that "Title VII protects persons in covered categories with respect to their immutable characteristics"). Mar-Jac itself records the race/national origin of its workers when they are "Hispanic" (Doc. 152-19; Doc. 152-20; Doc. 152-21; Doc. 152-22; Doc. 152-23; Doc. 65-27) and has in the past recorded applicant race as "Hispanic" (Doc. 65-27; Doc. 46-2 at 235–38). Thus, the Court rejects the notion that the term "non-Hispanic" is incapable of determination.

Regarding the available documentary evidence, these concerns pertain to administrative feasibility, which is not a precondition to class certification. *See Cherry*, 986 F.3d at 1303 ("A plaintiff proves administrative feasibility by explaining how the district court can locate the remainder of the class after certification."). This is particularly so since not every class member must be presently identified for ascertainability purposes. *See Carpenter*, 424 F.2d at 260. Race/national origin, whether prospective class members sought employment in unskilled position on the production floor of the Jasper Plant after February 22, 2016, and whether the prospective class members were not hired within 45-days of submitting an application are all objective criteria, "capable of being determined." *Id.* The class is therefore clearly defined and ascertainable.

14

Having determined that Davis has standing to represent the proposed classes and that they are clearly defined and ascertainable, the Court moves to the requirements of Rule 23(a). *See Cherry*, 986 F.3d at 1302. In discussing whether the Rule 23(b)(2) class was properly certified and whether the Court's denial of a Rule 23(b)(3) class should be reconsidered, the parties do not contest the Court's previous finding that Rule 23(a)'s requirements are satisfied. The Court sees no reason to disturb that finding at this time.[7] The Court now discusses arguments specific to the proposed Rule 23(b)(3) class first and then discusses arguments specific to the current Rule 23(b)(2) class.

## A. RULE 23(b)(3)

Certification of a Rule 23(b)(3) class is only appropriate if "the [C]ourt finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.

---

[7] Even with the new theories raised in recent briefing, the Court remains satisfied that the proposed class meets the numerosity requirement; that there is a common contention based on whether Mar-Jac's practices and policies amounted to disparate treatment and disparate impact of class members; that Davis's claims will be typical of the allegations and legal theories of prospective class members, namely that class members' claims arise from the same alleged discriminatory policies and practices of Mar-Jac and that these claims will be based on the same single-motive or mixed-motive disparate treatment legal theor[ies] and a disparate impact theory based on the three-strikes policy; and that adequacy of representation requirement is met. (Doc. 122 at 23–28.)

R. Civ. P. 23(b)(3). The predominance and superiority requirements are unique to class actions proceeding under Rule 23(b)(3).

In an attempt to establish the predominance element of the Rule 23(b)(3) class, which was absent and thus fatal to class certification the last two times that certification was considered, Davis has raised two new theories of liability for his disparate treatment claim.[8] First, Davis has argued that the Escalante trial evidence establishes that race or national origin was a "motivating factor" for each non-Hispanic class member not hired by Mar-Jac. (Doc. 154 at 16; Doc. 180 at 15–16.) Second, in Davis's Reply, he resurrects an earlier argument that this is a "pattern-or-practice" discrimination case under which the *Teamsters* method of proof applies. (Doc. 180 at 1.) Regarding his disparate impact claim, it appears that Davis's theory of liability is still based on the three-strikes rule,[9] which he claims is "favorably affect[ed]" by the Escalante trial evidence. (Doc. 180 at 15.)

In response to these arguments, Mar-Jac maintains that individual issues predominate over common ones, further arguing that any reliance on a "motivating

---

[8] While Davis claims that his theory of liability "is not new—the trial evidence supporting the Escalantes' previously submitted declarations is new" (Doc. 180 at 1), the Court mostly disagrees. In previous motions before the Court, Davis's primary theory of liability for disparate treatment was a single-motive theory, which he aimed to prove through the convincing mosaic or McDonnell-Douglas framework. (Doc. 122 at 10.)

[9] Davis has not directed the Court to any other facially neutral practice that could form the basis of a disparate impact claim.

factor" theory is misplaced. Additionally, Mar-Jac argues that any liability theory based on the Escalante evidence falls outside the scope of Davis's EEOC charge, and thus is barred for failure to exhaust administrative remedies, and that prior to certifying any class that the Court must rule on Mar-Jac's previously filed Daubert Motion. The parties do not dispute superiority on the face of their pleadings, though as the Court previously explained, *supra* pp. 14, their administrative feasibility arguments are really arguments pertaining to the superiority analysis.

Because the Court continues to believe that Davis has not satisfied the predominance requirement, the Court does not further address these alternative arguments.

### 1. *TEAMSTERS* FRAMEWORK

The Court begins the predominance analysis with Davis's arguments regarding the applicability of *Teamsters*. In its initial class certification opinion, the Court rejected that the *Teamsters* framework and inferences applied in this case. (Doc. 122 at 31 n.13.) The Court reaffirms that finding.

*Int'l Broth. of Teamsters v. United States* was a pattern-or-practice employment discrimination case. 431 U.S. 324 (1977); *see also E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286–87 (11th Cir. 2000) ("There are two theories of intentional discrimination under Title VII: disparate treatment and pattern or practice discrimination. . . .'[P]attern or practice cases are a variant of the disparate

treatment theory.'" (quoting *Lujan v. Franklin Cnty. Bd. of Educ.*, 766 F.2d 917, 929 (6th Cir. 1985))). In "the initial, 'liability' stage of a pattern-or-practice suit," *Teamsters*, 431 U.S. at 360, the plaintiff has the burden of showing that a pattern or practice of discrimination was the employer's "standard operating procedure," *id.* at 336. "Without any further evidence from [the plaintiff], the court's finding of a pattern or practice justifies an award of prospective relief." *Id.* at 361. When individual relief is sought, there is then a "second, 'remedial' stage of trial." *Id.* In the remedial phase, the plaintiff "need only show that an alleged individual discriminatee unsuccessfully applied for a job." *Id.* at 362. "[T]he burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." *Id.*

There is no question that the *Teamsters* method of proof "applies in private class actions alleging systemic disparate treatment in employment," i.e. pattern-or-practice cases. *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1237 (11th Cir. 2000) (citing *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 772 (1976)). But Davis's proposed class action does not qualify as a *Teamsters*'s pattern-or-practice class action for at least two reasons.

First, Davis has not established that a plant-wide policy of discrimination was Mar-Jac's "standard operating procedure—the regular rather than unusual practice." *Teamsters*, 431 U.S. at 336. As the Court previously explained in its first opinion

considering class certification (Doc. 122 at 31), the Eleventh Circuit has suggested that the *Teamsters* framework is appropriate in cases where the "number of African-Americans and Spanish-surnamed persons hired for line-driver positions approached the 'inexorable zero,'" or in cases where "in the 37 years preceding the institution of [the lawsuit] the [employer] did not have a single black on its payroll," not in cases where "it is undisputed that the [employer] hiring thousands of blacks." *Rutstein*, 211 F.3d at 1237 n.16 (first quoting *Teamsters*, 431 U.S. at 342 n.23; then quoting *Paradise v. Prescott*, 767 F.2d 1514, 1529 (11th Cir. 1985); then quoting *Reynolds v. Roberts*, 202 F.3d 103, 1319 n.27 (11th Cir. 2000)). This is not a case where the number of non-Hispanics hired by Mar-Jac approached the "inexorable zero." Rather, Mar-Jac regularly hired non-Hispanic applicants—in fact, a majority Mar-Jac's new hires were non-Hispanic. (Doc. 92-1; Doc. 159-1; Doc. 176-14; Doc. 179-15.)

Second, the Eleventh Circuit has also indicated that the *Teamsters*'s rationale is inappropriate when the class seeks legal relief, rather than merely equitable relief. *See Rutstein*, 211 F.3d at 1239 (citing *Carey v. Piphus*, 435 U.S. 247, 264 (1978) for the proposition that individual plaintiffs cannot receive compensatory damages without proving that "injury actually was caused"). As the class seeks both equitable

relief, like backpay, and legal relief (Doc. 29), the *Teamsters* framework is further inapposite.[10]

## 2. TRADITIONAL PREDOMINANCE FRAMEWORK

In determining whether "questions of law or fact common to class members predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(2), a district court must perform a "rigorous analysis," *Brown*, 817 F.3d at 1231. This analysis is "far more demanding" than Rule 23(a)'s commonality inquiry. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). The Court starts by "identify[ing] the parties' claims and defenses and their elements," then "classif[ies] these issues as common questions or individual questions" and determines whether the common questions predominate. *Brown*, 817 F.3d at 1234.

"An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W Rubenstein, Newberg on Class Actions § 4:50, at 196–97 (5th ed. 2012) (internal quotation marks

---

[10] Even if *Teamsters* applied, proceeding under the *Teamsters* framework would not necessarily mean that the proposed class would satisfy the Rule 23(b)(3) predominance requirement. *July v. Bd. of Sch. Comm'rs*, 291 F.R.D. 653, 661–63 (S.D. Ala. 2013) (citing *Cooper v. S. Co.*, 390 F.3d 695, 720, 722–23 (11th Cir. 2004), *abrogated on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58 (2006)) ([C]ertification of a Title VII pattern-or-practice class under Rule 23(b)(3) is extremely problematic.").

omitted)). "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), *abrogated on other grounds by Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 885 (11th Cir. 2023)). But "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Klay*, 382 F.3d at 1255.

One general rule of thumb is that common issues usually will not predominate if "the additional [or subtraction] of more plaintiffs to a class requires the presentation of significant amounts of new evidence." *Klay*, 382 F.3d at 1255. "'But predominance requires a qualitative assessment too; it is not bean counting,' and the 'relative importance' of the common versus individual questions also matters." *Brown*, 817 F.3d at 1235 (quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

### i.   TITLE VII DISPARATE TREATMENT CLASS

The Court starts with the proposed Title VII Disparate Treatment Class. As mentioned above, in an attempt to establish predominance, Davis has shifted his

liability theory from a single-motive theory, based on a convincing mosaic or McDonnell Douglas, to a mixed-motive theory, based on the "motivating factor" standard from *Quigg v. v. Thomas Cnty. Sch. Dist.*, 814 F3d 1227 (11th Cir. 2016). In a mixed-motive case, a plaintiff must establish, through direct or circumstantial evidence, that: "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)). When a plaintiff relies "solely on remarks that indirectly evidence discrimination, the employee must show the circumstances surrounding the remarks create a genuine issue of material fact that the employer 'actually relied on [the protected characteristic] in making its decision.'" *Quigg*, 814 F.3d at 1241 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), *superseded by statute*, Civil Rights Act of 1991, § 107, Stat. 1075)).

In asserting that race or national origin was a motivating factor in all Mar-Jac's hiring decisions, and that this issue predominates, Davis principally relies on two pieces of evidence from the Escalante trial: 1) the two official staffing contracts that Mar-Jac entered into with the Escalantes, which Davis characterizes as "racial set-asides" (Doc. 154 at 2, 6–9); and 2) Deivin Escalante's testimony that Linda Cox told him that "she only wanted Hispanic workers" and they "didn't need to hire

American or black people" (Doc. 154 at 17; Doc. 152 at 809–10; Doc. 180 at 19).[11] In the Reply, Davis clarified that this evidence from the Escalante trial merely bolsters the original evidence that the Court considered, such as the deposition testimony of Cox and Pendley and the Escalante affidavits. (Doc. 176 at 2.) He further asserts that the statements of Deivin Escalante and the testimony of Cox and Pendley, stating that supervisors preferred and requested Hispanic applicants and that they would participate in discriminatory hiring processes like sifting through application stacks in search of Hispanic applicants, constitute direct evidence of discrimination.

Due to the implications on the mixed-motive framework of whether the aforementioned evidence was direct or circumstantial evidence of discrimination, the Court begins with that analysis. "[D]irect evidence is evidence proving, without inference, that illegal reasons motivated an adverse employment action." *Quigg*, 814 F.3d at 1236 n.5. "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* at 1242 n.11 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004), *abrogated on other grounds by Lewis v. City*

---

[11] Davis also asks the Court to draw an adverse inference against Mar-Jac due to Cox's refusal to testify at the Escalante trial. (Doc. 154. at 7; Doc. 176 at 3–4.) Even if the Court did draw this inference, the analysis would not be affected.

*of Union City*, 918 F.3d 1213 (11th Cir. 2019)). "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296 (11th Cir. 2023) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

Regarding Deivin Escalante's testimony, the Court has no problem concluding that this evidence requires inference to find discrimination. Deivin Escalante's testimony claims that Mar-Jac leadership requested discriminatory hiring in *his* staffing decisions. Cox's alleged statements that "she only wanted Hispanic workers" and the Escalantes "didn't need to hire American or black people" [12] pertained directly to positions filled by the Escalantes: not to positions filled by Mar-Jac. The Escalantes were the decisionmakers in their own hiring, and Deivin Escalante's trial testimony was at best contradictory as to whether they actually followed Cox's alleged instructions. [13] Therefore, as Davis and fellow class members applied for positions with Mar-Jac and not the Escalantes, the statements

---

[12] Mar-Jac strongly denies that Cox made these statements.

[13] Deivin Escalante also testified: "We—we would hire whoever needed a job. If it's White, Black, Hispanic. It didn't matter. If they needed a job, we gave them an opportunity." (Doc. 152-1 at 845.)

are only suggestive that Mar-Jac did not hire the putative class based on race or national origin.

As to Cox and Pendley's testimony about the comments and practices of hiring supervisors, the Court reaches a somewhat different conclusion. For certain putative class members—i.e. those class members for whom hiring supervisors were the ultimate decisionmakers and whose applications were disregarded in favor of Hispanic applicants—the testimony shows, without inference, that race or national origin was a motivating factor in those class members being denied employment. But for class members like Davis—for whom a hiring supervisor was not the ultimate decisionmaker and for whom there was not evidence that hiring supervisors directly disregarded his application in favor of a Hispanic applicant's—Cox and Pendley's testimony was only circumstantial evidence of discrimination. Accordingly, class members relying merely on circumstantial evidence, like Davis, will have to further prove that Mar-Jac "actually relied" on race or national origin when making its hiring decisions—the class members relying on direct evidence will not have this burden.

This evidentiary distinction only further convinces that Court that issues common to the putative class do not predominate over issues unique to individual class members. *See Cooper*, 390 F.3d at 724 ("[W]hen disparate treatment is the basis of a class action, it is more likely that individual issues will predominate and

make proceeding in a class action format inappropriate."). No doubt, there are common issues. Putative class members would all likely rely on the aforementioned evidence as a part of their disparate treatment claims. But a litany of individual questions would remain. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) ("[W]e expect that most, if not all, of the plaintiffs' [disparate treatment] claims will stand or fall, not on the answer to the question whether Motel 6 has a practice or policy of racial discrimination, but on the resolution of . . . highly case-specific factual issues."); *Rutstein*, 211 F.3d at 1235 (holding that putative class of Jewish customers alleging a corporate policy of discriminating against Jews had not satisfied the predominance inquiry).

First, there would have to be an individual assessment over whether the particular class member could rely on Cox and Pendley's testimony as direct or circumstantial evidence. This would require inquiry into whether a class member was specifically rejected by a supervisor who had requested a Hispanic applicant instead or who had searched the application stacks for a Hispanic applicant. For applicants relying solely on circumstantial evidence like Davis, the Court would have to ask numerous questions to determine whether Mar-Jac "actually relied" on race or national origin in making the hiring decision: Was the plaintiff eligible for hire? Was Mar-Jac accepting applications when the plaintiff applied? Was Mar-Jac

hiring for that specific position? Did Mar-Jac have a legitimate, nondiscriminatory reason for not hiring the plaintiff?

Not to mention, "[i]n the predominance analysis, a district court must determine whether 'each plaintiff will likely have to provide some individualized proof that they have standing.'" *Green-Cooper*, 73 F.4th at 892 n.13 (quoting *Cordoba*, 942 F.3d at 1275). For all plaintiffs, this raises an individualized issue that Mar-Jac claims is common in its business—that being whether Mar-Jac actually tried to hire that Plaintiff, but the plaintiff voluntarily withdrew from the process. Additionally, there would be the question of whether each plaintiff's application overlapped with Mar-Jac's Escalante dealings.

Even more individualized questions arise when considering damage calculations and affirmative defenses. While individual damages issues and individual affirmative defenses are very unlikely to defeat a finding of predominance, such issues are certainly relevant. *See Brown*, 817 F.3d at 1239–41 (explaining that individual damages issues or affirmative defenses can only defeat predominance when they are "so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable" or when they are accompanied with other significant individual questions (*quoting Klay*, 382 F.3d at 1260)). As Plaintiffs have requested punitive damages and lost wages, the Court would have to conduct individualized inquiries into, among other things: the date each plaintiff

applied, the hourly rate for each plaintiff's sought-after position, and to what extent each plaintiff mitigated his or her lost earnings. This would not be formulaic. *See Klay*, 382 F.3d at 1259–60 ("Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification."); *Carriuolo*, 823 F.3d at 986 (explaining that the FDUTPA has a standardized, class-wide damages formula). Regarding affirmative defenses, the Court would have to conduct case-by-case inquiries into whether Mar-Jac "would have taken the same action in the absence of the impermissible motivating factor." *See* 42 U.S.C. § 200e–5(g)(2)(B). Considering all of these individualized questions, the Court cannot conclude that common issues predominate the individual ones.

### ii.    § 1981 DISPARATE TREATMENT

The "motivating factor" theory is not available for disparate treatment claims brought under § 1981. *See Comcast Corp. v. Nat'l Assoc. of African-American Owned Media*, 589 U.S. 1011, 1014 (2020). Therefore, the only questions that the Court must answer regarding whether the putative class may proceed under § 1981 is how the recasting of Cox and Pendley's testimony as direct evidence and how the new evidence from the Escalante trial affects the Court's previous analyses. (Doc. 122 at 29–31; Doc. 131 at 3–5.) The effect is insignificant.

As explained above, there would still have to be an individualized inquiry as to which class members could rely on Cox and Pendley's testimony as direct evidence. For the class members like Davis who would rely solely on circumstantial evidence, the addition of the Escalante evidence certainly bolsters Plaintiffs' cases under the convincing mosaic theory or the McDonnell-Douglas framework. But the same individual liability questions continue to predominate. *See Jackson*, F.3d 130 at 1005 (explaining that the allegation of a company-wide policy of intentional discrimination is alone insufficient to certify a disparate treatment Rule 23(b)(3) class and listing the substantial individualized questions that remain); *Rutstein*, 211 F.3d at 1235 (same). Those are: Was the plaintiff qualified for the position he or she sought? Was Mar-Jac accepting applications when the plaintiff applied? To which position did the plaintiff apply? Was Mar-Jac hiring for that specific position? Did Mar-Jac fill the sought-after position with a Hispanic applicant or a non-Hispanic applicant? Did Mar-Jac have a legitimate, nondiscriminatory reason for not hiring the plaintiff? Further, for all class members, the same individualized damages questions remain, such as: What was the hourly rate for the plaintiff's sought-after position, and to what extent did the plaintiff mitigate his or her lost earnings?[14]

---

[14] Additionally, the individualized questions regarding each class member's standing identified in the preceding section—such as whether each individual plaintiff was actually denied a job or actually affected by Mar-Jac's Escalante dealings—further shows that individual questions predominate. *See Cordoba*, 942 F.3d at 1264 ("At some point before it may order any form of relief to the putative class members, the court will have to sort out those plaintiffs who were actually injured from those who were not.").

Accordingly, the Court does not disturb its finding that individual issues predominate common ones.

### iii.   DISPARATE IMPACT CLASS

As with the § 1981 claim, Plaintiffs' disparate impact claim proceeds under the same legal theory as the Court examined in its previous Opinions. Plaintiffs still challenge the alleged discriminatory impact of the three-strikes rule on non-Hispanic applicants. The only difference in this Motion for Reconsideration is the addition of the Escalante trial evidence. This new evidence similarly does not establish predominance.

As the Court explained in its previous Opinions, there are many plaintiff-specific issues that accompany this claim: Did the plaintiff have three strikes when he or she applied? If not, does the plaintiff even have standing to challenge the rule? How much back pay does the plaintiff deserve? Did the plaintiff mitigate his damages? When did the plaintiff apply? Was the three-strikes policy in force (or was it "overridden") when the plaintiff applied? (Doc. 122 at 32; Doc. 131 at 5–6.) The Escalante trial evidence does not change the predominance of these individualized questions.

### 3.   ALTERING THE PROPOSED CLASS

Alternatively, Davis argues that the Court could alter the proposed class to the following:

> All persons that applied with Mar-Jac's Jasper Plant within 45-days of the Escalantes' staffing it; who sought, as noted on their application(s) maintained by Mar-Jac and or Mar-Jac's application log, a position or plant area like that staffed by the Escalantes; who Mar-Jac employed on its payroll at any other time; whose race and or ethnicity was maintained by Mar-Jac as something other than Hispanic; and, not hired within 45-days of making application.

(Doc. 180 at 26.); *see Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."), *cert. denied*, 479 U.S. 883 (1986).

But altering the class would be futile. For the Title VII disparate treatment class, the Court would still have to determine which applicants could use the Cox and Pendley testimony about the discriminatory practices of hiring supervisors as direct evidence. For the applicants like Davis who would be relying solely on circumstantial evidence, the Court would be confronted with the same individualized liability questions arising from case-by-case inquiries into whether Mar-Jac "actually relied" on the applicant's race or national origin. Further, the same individualized questions regarding damages and the "same decision" defense would remain. The Court would also have to conduct the individualized standing inquiry into whether an applicant did not voluntarily withdraw from the application process. For the § 1981 disparate treatment class, the Court would still have determine which applicants could use the Cox and Pendley testimony as direct evidence, and the Court would have to address many of the same individualized questions regarding liability,

standing, and damages. Lastly, for the disparate impact class, the Court would likewise have to individually inquire into the same liability, standing, and damages issues. Therefore, as altering the class would not satisfy the predominance inquiry for any of the proposed classes, the Court declines to certify any class under Rule 23(b)(3).

## B. RULE 23(b)(2)

A class is properly certified under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Unlike with a Rule 23(b)(3) class, a district court is not required to make separate findings regarding predominance and superiority. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011).

In arguing that the Court improperly certified the class under Rule 23(b)(2), Mar-Jac raises four main arguments:[15] 1) the injunction that Plaintiff seeks is a

---

[15] To the extent Mar-Jac also intended to argue that claims based on the Escalante evidence fall outside the scope of Davis's EEOC charge and are thus administratively barred for the Rule 23(b)(2) class, the Court rejects this argument. First, the Court notes that Davis was not required to file an EEOC charge for the § 1981 claim. *See Green v. Elixir Indus., Inc.*, 152 F. App'x 838, 839 (11th Cir. 2005). Second, for the Title VII claims, the Court rejects this argument because a plaintiff's judicial claim is merely "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (quoting *Alexander v. Fulton County*, 207 F.3d 1303, 1312 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003)). While Davis did not expressly mention the Escalantes in his EEOC charge, the factual

32

"follow-the-law-injunction"; 2) class certification is not necessary to issue any injunction Plaintiffs may seek; 3) Plaintiffs' request for declaratory and injunctive relief is moot due to a change in Mar-Jac hiring processes; and 4) the Court must rule on Mar-Jac's Daubert Motion regarding the reports and testimony of Dr. Liesl Fox prior to certification.[16] (Doc. 176 at 33–34; Doc. 150 at 18–20.) The Court addresses each argument in turn. [17]

First, the Court disagrees that any injunction it may enter would be an impermissible follow-the-law injunction. A follow-the-law injunction is one "demanding that a party do nothing more than 'obey the law.'" *Elend v. Basham*,

---

allegations in his charge discussed his unsuccessful application process, as an African-American man, and the disproportionate number of Hispanic workers at Mar-Jac. (Doc. 48-10.) Based on these allegations, the scope of the EEOC investigation could reasonably be expected to encompass Mar-Jac's dealings with the Escalantes.

And further, to the extent Mar-Jac intended to resurrect a previous argument that Davis's EEOC charge did not encompass his claims based on national-origin discrimination (Doc. 150 at 13), the Court likewise rejects that argument as well. This is because while Davis did not check the box for "national origin" discrimination on his charge, failure to check a box on the EEOC charge does not administratively bar a claim if the factual statement "could have reasonably been extended to encompass" the judicial claim. *Gregory*, 355 F.3d at 1280 (holding that a plaintiff's claims for retaliation were not administratively barred, despite her failure to check the appropriate box); *see also Sanchez*, 431 F.2d at 462 ("[T]he crucial element of a charge . . .is the factual statement contained therein."). Here, the factual allegations in Davis's claims could reasonably be expected to encompass national origin discrimination and therefore his Title VII claims regarding national origin discrimination would not be administratively barred.

[16] The Court previously denied the Daubert Motion (Doc. 62) without prejudice, granting Mar-Jac leave to reassert any Federal Rule of Evidence 702 arguments in a properly filed motion in limine. (Doc. 122 at 35.) The Court did not conduct full Daubert analysis.

[17] Mar-Jac has also expressed concern about providing notice to all class members. (Doc. 150 at 25.) Notice is not required for a Rule 23(b)(2) class. *See Wal-Mart*, 564 U.S. at 363. Therefore, the Court will not order notice be given to class members at this time.

471 F.3d 1199, 1209 (11th Cir. 2006). For example, an injunction ordering a City to refrain "from discriminating on the basis of race in its annexation decisions," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999), and an injunction "to ensure there's no violation of the First Amendment," *Elend*, 471 F.3d at 1210, were both impermissible follow-the-law-injunctions. "An injunction must therefore contain an operative command capable of enforcement." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (quoting *Longshoremen's Ass'n v. Marine Trade Ass'n*, 389 U.S. 64, 73–74 (1967)). Because "[w]ithout specific and enforceable language, 'an injunction does not give the restrained party fair notice of what conduct will risk contempt.'" *Williamson v. Ala. Dep't of Mental Health and Mental Retardation*, No. 7:19-cv-00669-LSC, 2021 WL 10893800, at * 3 (N.D. Ala. Mar. 19, 2021).

Here, the Court has explained that an injunction or series of injunctions restructuring and restricting Mar-Jac hiring practices could allow all class members to seek employment "on equal footing" with Hispanic applicants. (Doc. 131 at 7–8 (citing *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666).) The Court has specifically suggested two potential injunctions it could render in this case: a prohibition on hiring supervisors intentionally disregarding applicants sent by non-Hispanic applicants and a prohibition on Mar-Jac hiring independent contractors to solely seek Hispanic workers. (*Id.* at 8.) Conceivably, the Court could

also enjoin Mar-Jac from reinstating the three-strikes policy. These injunctions would not merely enjoin Mar-Jac from violating § 1981 or Title VII; rather, they specifically enjoin certain hiring policies and practices. Accordingly, these injunctions would not violate this circuit's prohibition of follow-the-law injunctions.

Second, regarding Mar-Jac's argument that class certification is not necessary to issue the injunctive relief sought, the Court remains convinced of "the indivisible nature of the injunctive or declaratory relief warranted—the notion that [Mar-Jac's] conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them at all." *Wal-Mart*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). As the Court explained in its earlier opinion certifying the Rule 23(b)(2) class, there is substantial evidence that Mar-Jac "act[ed] on grounds that apply generally to the class" by engaging in policies or practices that could disadvantage non-Hispanic applicants. (Doc. 131 at 7.) The Court is satisfied that a class for declaratory and injunctive relief would be appropriate.

Third, the Court disagrees that Plaintiffs' request for declaratory and injunctive relief is now moot. Mar-Jac contends that injunctive relief is now unnecessary because it has changed its hiring policies, specifically the three-strikes policy. (Doc. 150 at 18; Doc. 176 at 27; Doc. 150-1 ¶ 3.) But Davis has alleged

discriminatory hiring policies other than the three-strikes policy for which injunctive relief may be appropriate. (Doc. 131 at 7; Doc. 122 at 4–8; Doc. 176 at 1 n.2)

And further, in cases where a defendant voluntarily ceases his offending conduct, the case will not be mooted unless "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). This "require[s] more than a private party's assertion that its challenged conduct will not recur." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1356 (11th Cir. 2019). Rather, the Court considers "at least the following three factors: (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007). Here, Mar-Jac relies entirely on the Declaration of Human Resources Clerk, Breanna Tucker. (Doc. 150 at 18–19.) The three-strikes policy was a consistent Mar-Jac hiring policy and Mar-Jac has not acknowledged liability— Mar-Jac's motivation for changing the policy is disputed. Therefore, Mar-Jac has not demonstrated that the three-strikes policy cannot reasonably be expected to be reinstated. The request for declaratory and injunctive relief is not moot.

Finally, the Court partially agrees that the Daubert Motion (Doc. 62) is due to be ruled upon prior to certifying this class. In *Sher v. Raytheon Co.*, a panel of the Eleventh Circuit held that a district court erred when it refused to perform a full "*Daubert*-like critique of the proffered expert's qualifications." 419 F. App'x 887, 890 (11th Cir. 2011). The court found the Seventh Circuit's opinion in *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813 (7th Cir. 2010) persuasive, and it agreed with the Seventh Circuit's assertion that "when an expert's report or testimony is critical to class certification, as it is here . . ., a district court must conclusively rule on any challenge to the expert's qualifications or submission prior to ruling on a class certification motion." *Sher*, 419 F. App'x at 890 (quoting *Am. Honda Motor Co., Inc.*, 600 F.3d at 815–16). The court's reasoning was that "a district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification." *Sher*, 419 F. App'x at 891. This notion from *Am. Honda Motor Co., Inc.* was later favorably cited by the Eleventh Circuit in *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014).

As the Court explained in its earlier opinion, there is plenty of evidence other than Dr. Fox's reports and testimony that suggests Mar-Jac acted "on grounds that apply generally to the class as a whole" regarding Plaintiffs' disparate treatment

claim. But as Plaintiffs' disparate impact claims are premised largely on the findings of Dr. Fox, a Daubert-critique is likely appropriate for the certification of that class.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court held that Federal Rule of Evidence 702 "imposes a special obligation upon a trial judge to ensure that [expert] testimony is not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 137 (1999). In the Eleventh Circuit, courts use a three-part test to fulfill this obligation, finding that expert testimony is admissible if the proponent of the expert shows: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)); *see United States v. Ware*, 69 F.4th 830, 846 (11th Cir. 2023). As a part of the reliability prong, courts consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK*

*Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). But the analysis is flexible, and the reliability factors are not a "definitive checklist." *Daubert*, 509 U.S. at 593–94.

Mar-Jac does not contest Dr. Fox's qualifications, but it challenges the reliability and helpfulness of her testimony. (Doc. 62.)[18] The Court easily finds that Dr. Fox's testimony would be helpful to a jury because Dr. Fox's testimony pertains to complex statistical analyses. These are "matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). While reliability is a tougher call, the Court still cannot say that Dr. Fox's testimony would be unreliable. In rendering her conclusions, Dr. Fox employs standard deviation methodology and relies upon the Uniform Guidelines on Employee Selection Procedures, (29 CFR § 1607) ("Uniform Guidelines") and Questions and Answers on Uniform Guidelines on Employee Selection Procedures, 44 FR 11996, March 2, 1979 ("Uniform Guidelines Q&A"). (Doc. 85 at 1; Doc. 65-27 at 3; Doc. 65-29 at 3; Doc. 65-30 at 5; Doc. 65-31 at 3.) Standard deviation methodology has been and can be tested, it has been subject to publication, and it is generally accepted within the statistics community. Dr. Fox also has explained the margin of error accounted for when conducting these analyses. (Doc. 65-27 at 8.)

---

[18] Based on a review of Dr. Fox's curriculum vitae (Doc. 65-27 at 13–17), the Court is satisfied of her qualifications.

Mar-Jac argues that Dr. Fox's reports and findings should be excluded due to her use of proxy data,[19] her failure to consider all relevant factors, and the "incompleteness" of her analysis regarding three-strike applications (Doc. 62.) But Mar-Jac's arguments for excluding Dr. Fox's reports and testimony really come down to the persuasiveness of her findings, and "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341. Rather, to the extent there are gaps in Dr. Fox's analysis, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Accordingly. Dr. Fox is conditionally admitted as an expert regarding the disparate treatment class.

## IV.  CONCLUSION

For the reasons discussed above, the Court reaffirms certification of the following Rule 23(b)(2) class:

> All persons not of Hispanic race and or origin seeking employment on or after February 22, 2016 in unskilled positions on the production floor of Mar-Jac's Jasper Plant, and not hired within 45-days after seeking such employment.

---

[19] As the Court previously discussed in an earlier opinion, Dr. Fox's use of a proxy benchmark is particularly justified due to Mar-Jac's poor recordkeeping. (Doc. 122 at 18–19.)

In so ruling, the Court rejects Mar-Jac's Daubert challenge to Dr. Fox's reports and testimony regarding the disparate treatment class. The Court also reaffirms the denial of a Rule 23(b)(3) class. Plaintiffs' Motion to Reconsider Certification of a Rule 23(b)(3) class (Doc. 153) and Defendant Mar-Jac Poultry, LLC's (hereinafter "Mar-Jac") Brief in Support of Reconsideration of Class Certification (Doc. 150) regarding the Rule 23(b)(2) class are DENIED.

All of Davis's individual claims for monetary relief remain pending.

**DONE** and **ORDERED** on January 19, 2024.

L. Scott Coogler
United States District Judge

215755